■ FUNDAMENTAL PORTFOLIO ADVISORS, INC., et al., Appellants, v TOCQUEVILLE ASSET MANAGEMENT, L.P., et al., Respondents. [802 NYS2d 17]—

Order, Supreme Court, New York County (Richard B. Lowe, III, J.), entered February 13, 2004, which granted defendants' motion for summary judgment dismissing the complaint, and denied plaintiffs' cross motion for partial summary judgment on the issue of liability, affirmed, without costs.

This breach of contract action arises from the decision of the board of directors of a family of mutual funds (collectively the Fundamental Funds or the Funds) to replace plaintiffs as their investment advisor and distributor. Plaintiff Lance Brofman is the founder and former president and chief portfolio strategist of the Funds. He is also the principal shareholder and president of the Funds' former advisor, plaintiff Fundamental Portfolio Advisors (FPA), and a shareholder of their former distributor, plaintiff Fundamental Service Corp. (FSC).

Defendant Tocqueville Asset Management (Tocqueville) is an investment advisor to mutual funds, which succeeded plaintiffs to the management of the Fundamental Funds allegedly in breach of a noncompete clause executed while the parties were negotiating the merger of their businesses and the transfer to defendants of plaintiffs' management contracts with the Fundamental Funds.

In September 1996, Christopher Culp, a Tocqueville officer and portfolio manager, and defendant Robert Kleinschmidt, president of Tocqueville, met with plaintiff Brofman and his partner, nonparty Vincent Malanga, then president of FPA and vice-president of FSC, as well as a member of the board of the Fundamental Funds, to discuss Tocqueville's merger with FPA or acquisition of FPA's investment advisory assets. Culp and Kleinschmidt executed a nondisclosure, noncompete agreement, which provided that ''[w]hereas, [Kleinschmidt and Culp] and

Brofman and Malanga intend discussing various business proposals involving the investment advisory and mutual funds business," Kleinschmidt and Culp "agree not to solicit or engage in any business activity involving any of the mutual funds which have had, or ever in the future have business relationships with FPA or any company affiliated or associated with FPA, without prior written consent of both Brofman and Malanga."

The agreement also provided that "[n]o delay or omission by FPA, Brofman or Malanga in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by FPA, Brofman and Malanga on any one occasion is effective only in that instance and will not be construed as a bar or waiver of any right on any other occasion."

While the parties were negotiating, the board of directors of the Funds decided, at its December 31, 1996 meeting, to renew FPA's contract but to remove Brofman, who had a history of securities violations, from his position as chief portfolio strategist and to ban him from any position of responsibility on behalf of the Funds. In early 1997, FPA tentatively agreed to sell its investment advisory assets to Tocqueville for a price equal to 63% of the revenues received by Tocqueville from existing client accounts of the Funds for five years, or about $6 million, based on the Funds' assets at the time. It was understood that, in return, Tocqueville would help FPA in its relationship with the members of the board and Culp would perform due diligence for Tocqueville and simultaneously manage the Funds' portfolios.

Thus, in February 1997, Culp began operating the Funds from FPA's offices while performing due diligence for Tocqueville. Tocqueville was given access to FPA's mutual fund shareholder information and Culp made presentations to the board concerning portfolio management. Malanga told his fellow board members at a March 28, 1997 meeting that, as a result of the board's removal of Brofman as chief portfolio strategist, FPA had, among other things, "recruited Mr. Christopher P. Culp to serve, without compensation, as a member of a three-person investment committee created for the purpose of managing the Funds' investment portfolios." Meanwhile, negotiations over Tocqueville's purchase of FPA's investment advisory assets continued.

Also at the end of March, the board decided to replace FPA as soon as an acceptable replacement could be found, and in April, Malanga, on behalf of FPA, forwarded to the members of the board Tocqueville's proposal to advise the Funds. In his cover

letter, Malanga said that FPA "strongly endorse[d]" the proposal, "believ[ing] it to be in the best interest of [the Funds'] past, present, and future shareholders." He said that, among other strengths, "Tocqueville's managers are intimately acquainted with [the] Funds" and, because Culp "currently act[s] as an unpaid member of Fundamental's portfolio management committee, . . . they are fully aware of the operation of the Funds and their portfolio composition."

In May 1997, the board sent four investment advisory firms, including Tocqueville, requests for proposals to replace FPA, and the board met in July to consider the proposals received from Tocqueville and another firm. At that meeting, board member L. Greg Ferrone pointed out that Tocqueville "has shown enormous good will over the last few months and that they know the Fund portfolios quite well." Malanga moved for approval of Tocqueville's proposal and board member James C. Armstrong seconded the motion. After some discussion, the board voted unanimously that it was the sentiment of the board members to proceed with the Tocqueville transaction, subject to review and final approval at the July 15, 1997 meeting of the Funds' board.

The July 16, 1997 supplement to the Fundamental Funds' April 30, 1997 prospectus states that, subject to shareholder approval, the Funds adopted a plan by which the Fundamental Funds would transfer their assets and liabilities to a newly created corresponding series of "Tocqueville Funds" in exchange for shares of the Tocqueville Funds. The supplement notes that Tocqueville Asset Management L.P. serves as investment advisor to the Tocqueville Funds.

In December 1997, instead of renewing FPA's management agreement for one year, as was its custom, the board approved FPA's continuing for only 90 days, pending Tocqueville's takeover of the Funds' management. At the expiration of the 90 days, the board approved a 60-day continuance.

However, plaintiffs had concluded no agreement with Tocqueville to sell the latter its investment advisory assets, and in April 1998 Brofman launched a proxy battle seeking a shareholder vote to replace the board members who wanted to appoint Tocqueville with members who would retain FPA as advisor. Some of the proposed members were loyal to FPA because they knew that Tocqueville would not permit them to continue "market timing," a controversial investment strategy. In early May 1998, FPA filed its proxy materials and sent the shareholders notice of a special meeting to be held on May 29, 1998, the day before FPA's 60-day continuance was to expire. On May 27,

board member Armstrong commenced a shareholder action in federal court challenging the special meeting on procedural grounds and claiming that the proxy materials were inaccurate and misleading. The court granted a temporary restraining order enjoining the meeting. The parties then stipulated to stay the action and agreed that the board and FPA would submit new proxy materials, which they did on June 19, 1998.

Meanwhile, on May 30, 1998, at a meeting called to select an interim advisor to the Funds, the board heard presentations by FPA, Tocqueville and a third firm. It then voted to allow FPA's 60-day continuance to expire and, over Malanga's opposition, to appoint Tocqueville as interim advisor for a period not to exceed 120 days from June 1, 1998. Tocqueville served as interim advisor until September 28, 1998, unable to come to an agreement with the board on the market-timing issue.

Plaintiffs allege that defendants breached the noncompete agreement by engaging in business activity involving the Funds without the prior written consent of Brofman and Malanga, causing the latter to lose their business relationship with the Funds and to suffer damages of at least $6 million.

Defendants argue that the record demonstrates that the board's decision to replace plaintiffs was a result not of defendants' conduct but of the board's loss of confidence in plaintiffs. Indeed, the record reflects the Fundamental Funds' poor performance between 1987 and 1997 and Brofman's and FPA's history of chronic legal violations, which culminated, in early 2001, in the Securities and Exchange Commission's permanent ban of Brofman from the securities industry. The board decided at the end of 1996 to remove Brofman from his position as chief portfolio strategist and to ban him from any position of responsibility for the Funds. It decided at the end of March 1997 to replace FPA as advisor as soon as an acceptable replacement could be found. Culp had only begun working out of FPA's offices in February 1997, and Malanga had only so informed the board at the end of March. Thus, the board made its decision to replace FPA long before it had become disposed toward Tocqueville.

Moreover, when in December 1997 the board approved the continuance of its agreements with FPA for 90 days, "in contemplation of the consummation of a transaction pursuant to which Tocqueville Asset Management L.P. would assume management of the assets of the Funds," it stated, "Otherwise, the [agreements] would have expired on January 1, 1998." When, at the end of the 90 days, the board continued the agreements with FPA for another 60 days, again "in contemplation

of the consummation of a transaction pursuant to which Tocqueville Asset Management L.P. would assume management of the assets of the Funds," it stated, "Otherwise, the [agreements] would have expired on April 1, 1998." Thus, the record demonstrates that the board's decision to replace plaintiffs was, as defendants argue, a result not of defendants' actions but of the board's loss of confidence in plaintiffs, and that the board soon would have hired, if not defendants, then another firm to replace plaintiffs. Indeed, it appears that it is only because of Tocqueville's involvement that FPA was allowed to continue on as the advisor for the Funds for an additional five months.

Defendants further argue that there was no breach of the noncompete agreement because Brofman and Malanga consented to their attempt to become advisors to the board, by choosing Culp to replace Brofman as chief portfolio strategist for the Funds and introducing him to the other board members, who agreed to his participation in the day-to-day investment decisions for the Funds, and by endorsing, in writing, in Malanga's April 1997 letter to his fellow board members, the appointment of Tocqueville as FPA's successor investment advisor to the Funds.

Plaintiffs argue, through Brofman, that they never waived the requirement of written consent to defendants' engaging in business involving the Funds, because Culp's working in FPA's offices was for the purpose of due diligence, and that plaintiffs' endorsement of Tocqueville to replace FPA was tied to the proposal involving the purchase of the management contracts from FPA, which defendants, and the board, understood.

The motion court correctly found that plaintiffs waived the term of the agreement requiring their prior written consent to defendants' soliciting or engaging in business activity involving the Funds.

Waiver is the intentional relinquishment of a known right, and therefore may be inferred from conduct or a failure to act that "evince[s] an intent not to claim the purported advantage" (*Hadden v Consolidated Edison Co. of N.Y.*, 45 NY2d 466, 469 [1978]). Whether or not the intent existed is generally a question of fact (*Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y.*, 61 NY2d 442, 446 [1984]). However, the record before us belies plaintiffs' argument that the participation of Tocqueville, through Culp, in the day-to-day investment decisions for the Funds was for the purpose of doing due diligence to learn the business. Indeed, the complaint alleges that on February 18, 1997, Culp "began operating both the Tocqueville Bond Funds and the Fundamental Funds out of the offices of FPA, while

performing due diligence for [Tocqueville] regarding the acquisition of the Fundamental Funds. [Tocqueville] was given full access to all FPA information, including mutual fund shareholder information." The record demonstrates instead that plaintiffs gave their consent orally, in writing and by their conduct, to Tocqueville's being appointed investment advisor to the Funds.

While there was a nonwaiver clause in the noncompete agreement (*supra*), it applied expressly to discrete expressions of consent. Thus, waiver based on the continuous course of conduct plaintiffs engaged in from February 1997 to April 1998 was not rendered ineffective by the nonwaiver clause.

As to Culp's work in FPA's offices, he testified at examination before trial that in February 1997, he was "actively managing the funds," which involved "[i]nvesting[, p]urchasing and selling, managing inflows and outflows." He made presentations to the board at its quarterly meetings, discussing his trading strategy, fund performance, "[i]ssues and concerns, some of which were ongoing, and how we were dealing with those." The purpose of the presentations was "[t]o give the board of trustees an accurate assessment of the current—of past performance, current state and future direction of the fund." As a board member, Malanga attended the meetings and heard the presentations and raised no objection to Culp's giving them. To the contrary, Culp testified, "I was summoned to the board." Nor did Brofman raise any objection to Culp's giving these presentations to the board. Indeed, he testified, "The opposite, we were the ones who sort of arranged for him to do the due diligence and be there, we were trying to get the deal done, we wanted to sell it to Mr. Kleinschmidt." Although Brofman couched his testimony in terms of due diligence and the deal, it is clear that what plaintiffs arranged for Culp to do was to engage in business activity involving the Funds, notwithstanding the noncompete clause.

As for the board, in the April 2, 1997 supplement to each Fund's April 1996 prospectus, it stated that "[p]ortfolio management responsibilities have been transferred from the Fund's former portfolio strategist to an investment committee [whose members include] Christopher P. Culp, a portfolio co-manager affiliated with Tocqueville Asset Management, L.P." The supplemental prospectus makes no mention of due diligence. Moreover, in August 1997, Culp left Tocqueville, and FPA's offices, and was replaced, with plaintiffs' consent, by another Tocqueville portfolio manager, defendant Drew Rankin. Brofman testified that "we were told Rankin was going to be the person managing the portfolios" and that he regarded Rankin as a satisfactory replacement for

Culp. That Tocqueville's participation on the investment committee continued for another year is also inconsistent with plaintiffs' claim that the purpose of the participation was no more than due diligence.

Plaintiffs contend that Malanga's April 4, 1997 letter to the board "strongly endors[ing]" Tocqueville's proposal was a recommendation that the Board "approve Tocqueville's acquisition of contracts from FPA and its payment of a fee to FPA based upon a percentage of assets under management." However, Malanga's letter describes Tocqueville's proposal as a proposal "for the acquisition of the assets of the Fundamental Funds"—not FPA's assets—and urges that it is "in the best interest of Fundamental's past, present, and future shareholders"—not FPA's interest—and concludes that "the managers of FPA strongly urge Fundamental's Directors to approve this acquisition."

At the May 1998 meeting at which the board chose Tocqueville to act as interim advisor to the Funds, board member Armstrong argued that Tocqueville could provide "an uninterrupted administrative transition that would benefit the Funds' shareholders." At the time, Tocqueville, with FPA's blessing, had been providing advisory services to the Funds for more than a year.

The motion court found that having waived the noncompete clause, plaintiffs withdrew their consent, but the court concluded that they should be estopped from benefitting from their withdrawal of consent because the board would not have appointed Tocqueville advisor, even on an interim basis, if plaintiffs had not encouraged and assisted Tocqueville in seeking the appointment (*see Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d 175, 184 [1982] ["estoppel rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury" (citations and internal quotation marks omitted)]). Indeed, Tocqueville committed resources to providing advisory services to the Funds, through FPA, for more than a year in hopes of being appointed advisor to the Funds, and with the endorsement, encouragement and assistance of plaintiffs, and it is apparent that the work Tocqueville did for the Funds in that period was integral to the board's appointing it interim advisor. Thus, plaintiffs are estopped from denying their consent to the appointment, "the efficient cause of which is [their] own conduct" (*Matter of County of Westchester v P. & M. Materials Corp.*, 20 AD2d 431, 436 [1964]).

Moreover, even if Tocqueville were found to have violated the noncompete clause during the four-month period after FPA was

terminated, FPA cannot establish any damages since, as earlier indicated, FPA would, in any event, have been terminated some five months earlier, but for Tocqueville's assistance. Concur—Mazzarelli, J.P., Ellerin, Williams and Sweeny, JJ.

Saxe, J., dissents in a memorandum as follows: This breach of contract action arises out of defendants' alleged violation of a noncompete agreement the parties entered into in the course of exploring a possible acquisition by defendant investment advisory firm, Tocqueville Asset Management, L.P., of the investment advisory assets of plaintiff Fundamental Portfolio Advisors (FPA), an investment advisory firm. I disagree with the majority's award of summary judgment to defendants, because issues of fact make it improper to conclude as a matter of law that plaintiffs waived their rights under the parties' contract. Nor are undisputed grounds presented for imposition of an estoppel preventing the withdrawal of any such waiver.

Plaintiff Lance Brofman is the principal shareholder and president of plaintiff FPA, as well as a shareholder of plaintiff Fundamental Service Corp. (FSC), the broker/dealer affiliated with FPA; the other part owner and officer of FPA and FSC was Vincent Malanga. FPA had been the investment advisor for a group of five mutual funds (collectively, the Fundamental Funds or the Funds) since 1980, when Brofman founded the first of the Funds; FSC was their distributor. For over a decade, Brofman served, through FPA, as the Funds' chief portfolio strategist.

In 1994, in the wake of a Securities and Exchange Commission (SEC) investigation into whether FPA had properly disclosed the Funds' risks, and in view of the concerns of certain of the Funds' directors, Brofman and Malanga contemplated selling the business. The complaint alleges that on October 17, 1995, Christopher Culp, an officer of defendant Tocqueville, contacted Brofman and Malanga to propose the possibility of a merger or acquisition by Tocqueville of FPA, and after additional conversations, the two firms sent each other relevant publicly available documents such as annual reports and prospectuses for the mutual funds. Nonpublic information would be provided only at such time as Tocqueville signed a noncompete agreement to prevent direct solicitation by Tocqueville of the funds managed by FPA.

On September 24, 1996, at a meeting attended by Robert Kleinschmidt, Tocqueville's president, along with Culp, Brofman and Malanga, it was agreed that, as part of Tocqueville's due diligence to observe whether the five mutual funds managed by FPA were a good fit with those managed by Tocqueville,

Christopher Culp would work from FPA's office for a few months. In exchange, Tocqueville's representatives, including Kleinschmidt and Culp, executed a nondisclosure and noncompete agreement, in which they agreed "not to solicit or engage in any business activity involving any of the mutual funds which have had, or ever in the future have business relationships with FPA . . . without prior written consent of both Brofman and Malanga." The agreement also contained a nonwaiver clause, providing that "No delay or omission by FPA, Brofman or Malanga in exercising any right under this Agreement will operate as a waiver of that or any other right," and that any "waiver or consent given by FPA, Brofman and Malanga on any one occasion is effective only in that instance and will not be construed as a bar or waiver of any right on any other occasion."

At its December 31, 1996 meeting, the board of directors of the Fundamental Funds renewed FPA's contract, although it prohibited Brofman from continuing to serve as chief portfolio strategist and banned him from making decisions or trades on behalf of the Funds.

In early 1997, FPA and Tocqueville arrived at a tentative agreement for Tocqueville to purchase FPA's investment advisory assets for a percentage of the Funds' revenues, estimated to come to a total of approximately $6 million. With FPA's permission, on February 18, 1997, Culp began to work at FPA's offices on behalf of the Funds, for the purpose of performing due diligence and learning how FPA did business. To enable Culp to operate the Funds while performing due diligence, beginning in February 1997 Culp was given access to FPA's mutual fund shareholder information, and permitted to make presentations to the Funds' board regarding portfolio management.

In April, Malanga, on behalf of FPA, forwarded to the Funds' board Tocqueville's proposal to acquire FPA's contracts and take over as advisor to the Funds, with a letter "strongly endors[ing]" the proposal. The board neither approved nor rejected Tocqueville's proposal. Rather, in May 1997, the board sent four investment advisory firms, including Tocqueville, requests for proposals regarding the management of the Funds' assets; notably, the requests specified that they were "for the purchase of the existing management contracts of the five funds from the current advisor [FPA]."

Although throughout this period negotiations continued between FPA and Tocqueville, no deal was reached. Plaintiffs allege that in late November 1997, Kleinschmidt told others, including major FPA customer Ken Wideletz, who represented

$70 million in funds, that he intended to acquire the Fundamental Funds with or without FPA's consent. Tocqueville vice-president Drew Rankin called Wideletz and asked for his support in his company's takeover of the Funds, and Kleinschmidt tried to convince two trustees of the Funds to turn them over to Tocqueville.

In December 1997, the Funds renewed FPA's management agreement for a period of only 90 days, instead of its usual one-year term, in contemplation of the consummation of the transaction pursuant to which Tocqueville would assume the Funds' management. At the expiration of the 90 days, the board approved a 60-day continuance, through May 30, 1998.

In late May 1998, Tocqueville was appointed interim investment advisor to the Funds, and Tocqueville Securities as their distributor, as of June 1, 1998. Tocqueville's Kleinschmidt and Lyons were appointed president and vice-president, respectively, of the Funds.

Plaintiffs commenced this action, alleging that defendants breached the noncompete agreement by engaging in business activity with the Fundamental Funds without plaintiffs' prior written consent, and thereby caused plaintiffs' loss of their business relationship with the Funds; plaintiffs sought $6 million in damages for breach of contract.

Defendants moved for summary judgment dismissing the complaint, relying on minutes of meetings of the Funds' board of directors in order to assert that the decision of the Funds' board to replace plaintiffs was the result of plaintiffs' own poor work and misconduct, and was not due to anything defendants had done. Defendants also asserted an entitlement to dismissal on the grounds of waiver and estoppel.

The IAS court dismissed plaintiffs' contract claim, finding that Brofman and Malanga had waived the noncompete agreement's requirement of written consent by encouraging and assisting Tocqueville in seeking appointment as investment advisor to the Funds. To the extent they may have subsequently withdrawn their consent, the court found that they were estopped from doing so because the Funds' board had already accepted Tocqueville as interim advisor, and would not have done so without Brofman and Malanga's encouragement. The majority affirms the dismissal. I disagree.

It is undisputed that defendants ultimately both solicited and engaged in business activity with the Funds without plaintiffs' consent, despite their agreement "not to solicit or engage in any business activity involving any of the mutual funds" without the prior written consent of plaintiffs' principals. Nevertheless,

the majority dismisses plaintiffs' breach of contract claim in the face of this clear breach, because it holds that in the course of the contemplated acquisition process, plaintiffs waived the written consent condition.

Ironically, the finding that plaintiffs waived the written consent provision depends upon the very actions that plaintiffs took in reliance upon that same provision. That is, in order to proceed toward the consummation of the contemplated purchase by Tocqueville of FPA's investment advisory assets, namely, the Funds, while negotiations were ongoing, plaintiffs took the steps necessary to give the Funds grounds to approve of Tocqueville stepping into FPA's shoes and managing the Funds' investments: they permitted Tocqueville's representatives to work in a management capacity for the Funds in order to permit Tocqueville to demonstrate that it would be able to successfully take on the Funds' management. FPA permitted this because it was protected by defendants' noncompete agreement, so that if Tocqueville went on to solicit or do business with the Funds without having obtained the written consent of FPA—which it would obtain in the context of a final agreement with FPA— Tocqueville would be liable to FPA for a breach of that agreement. Indeed, finding the existence of a waiver as a matter of law here requires viewing the parties' noncompete agreement as failing to accomplish its only goal: that of ensuring that FPA's cooperation with Tocqueville in its contemplated acquisition of FPA's assets would not result in Tocqueville replacing FPA as investment advisor to the Funds without payment to FPA.

The showing contained in the record before us fails to support the finding of waiver as a matter of law. A waiver must be "clearly established" (*Barbour v Knecht*, 296 AD2d 218, 226 [2002]), "unmistakably manifested" and "not lightly presumed" (*Navillus Tile v Turner Constr. Co.*, 2 AD3d 209, 211 [2003]). It may only be inferred from conduct or a failure to act where that conduct "evince[s] an intent not to claim the purported advantage" (*Hadden v Consolidated Edison Co. of N.Y.*, 45 NY2d 466, 469 [1978]), and whether or not that intent existed is generally a question of fact (*see Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y.*, 61 NY2d 442, 446 [1984]). Plaintiffs' conduct, as reflected in the record, does not establish grounds to infer that they intended to relinquish the expected advantage that Tocqueville would not on its own engage in a direct business relationship with the Funds except by agreement with plaintiffs. Indeed, plaintiffs' conduct during the course of negotiations, in promoting Tocqueville's management of the Funds, was intended to ultimately bring about the contemplated

transfer of the management contract from FPA to Tocqueville in exchange for that payment. That conduct is insufficient to permit the inference of an intent to waive the written consent requirement as a matter of law.

This is especially so in the face of the agreement's nonwaiver clause. Generally, a specific nonwaiver clause is effective to bar claims of waiver (*see Excel Graphics Tech. v CFG/AGSCB 75 Ninth Ave.*, 1 AD3d 65, 69-70 [2003], *lv dismissed* 2 NY3d 794 [2004]). While there are instances where waiver has been found even in the face of a nonwaiver clause, these cases involve efforts to prevent forfeiture by preserving a leasehold or some similar interest (*see e.g. TSS-Seedman's, Inc. v Elota Realty Co.*, 72 NY2d 1024, 1027 [1988]; *Atkin's Waste Materials v May*, 34 NY2d 422 [1974]; *Lee v Wright*, 108 AD2d 678 [1985]; *Dice v Inwood Hills Condominium*, 237 AD2d 403 [1997]), which concept is inapplicable here.

Moreover, since the nonwaiver clause also specifically provided that "[a] waiver or consent given by FPA, Brofman or Malanga on any one occasion is effective only in that instance and will not be construed as a bar or waiver of any right on any other occasion," even if plaintiffs' consent to have Culp work in FPA's offices during the merger negotiations and for purposes of due diligence may be viewed as waiving certain rights, it may not be relied upon to operate as establishing consent, as a matter of law, to all types of business interactions between Tocqueville and the Funds in the absence of FPA's approval.

It is further inappropriate to hold that plaintiffs must be estopped from withdrawing their previous consent to Tocqueville's seeking appointment as investment advisor to the Funds, because the elements of estoppel were not established as a matter of law. In order to impose an estoppel, the party to be estopped must have made a false representation, with the intention or expectation that this misrepresentation would be acted upon (*see BWA Corp. v Alltrans Express U.S.A.*, 112 AD2d 850, 853 [1985]). Additionally, the party seeking the estoppel must show a lack of knowledge of the true facts, reliance on the misrepresentation, and a prejudicial change in position (*id.*). The rationale for imposing such an estoppel is to protect the party seeking the estoppel from a fraud or injustice perpetrated by the party being estopped (*see* 57 NY Jur 2d, Estoppel, Ratification, and Waiver § 3).

Here, no misrepresentation was made to defendants, and defendants knew the true facts. Moreover, the requirement of detrimental reliance is not established on this record (*see Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d 175,

184 [1982]; *see e.g. Linarello v City Univ. of N.Y.,* 6 AD3d 192, 195 [2004]). An assertion that plaintiffs failed to provide the necessary written consent after Tocqueville took steps in the expectation that such consent would be provided is insufficient. The parties had entered into an arrangement which contemplated that Tocqueville would pay plaintiffs if it succeeded in taking over management of the Funds; under the parties' agreement, plaintiffs had the right to withhold their permission for such an arrangement unless a mutually acceptable payment was agreed upon. For plaintiffs to have acted in accordance with that arrangement cannot provide a basis for an estoppel.

The majority reasons that the board's decision to replace FPA with Tocqueville was not a result of defendants' actions, but based solely on its loss of confidence in plaintiffs. However, aside from the clear factual nature of the determination of whether the board would have replaced FPA in the absence of a viable replacement, the fact also remains that even though the Funds were free to hire whatever management company they chose, Tocqueville was contractually bound to plaintiffs to not solicit or do business with the Funds without plaintiffs' consent. Regardless of the Funds' motivations and reasoning, Tocqueville was in breach of the contract by stepping in without plaintiff's consent.

Finally, the conclusion that FPA cannot establish any damages clearly constitutes a finding of fact unwarranted in the context of this summary judgment motion.

Nor did the SEC finding against Brofman present a bar to plaintiffs' recovery. Not only was the matter still on review at the agency at the time of this summary judgment motion, but, more importantly, illegality or fraud will preclude recovery, as a matter of public policy, only where the claimed recovery is " 'central to or a dominant part of the plaintiff's whole course of conduct in performance of the contract' " (*Ross Bicycles v Citibank,* 178 AD2d 388, 390 [1991], quoting *McConnell v Commonwealth Pictures Corp.,* 7 NY2d 465, 471 [1960]). Here, the recovery sought does not emanate from and is not directly related to the SEC's allegations of wrongdoing against Brofman.

In addition, while the amount that plaintiffs might have recovered from a merger transaction was based upon a percentage of future earnings that Brofman and FPA might not ultimately have been allowed to collect, the matter remained subject to negotiation with the SEC and it might well be that the parties could have structured a method of payment to avoid this problem.

For all the foregoing reasons, it is inappropriate to dispose of this action in this context.